**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA PERKINS and DIANNA ALSTON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 09-0296-CG-N** |
| | ) | |
| **CITY OF CREOLA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This cause is before the court on defendants' motion for summary judgment (Doc. 26), plaintiff's opposition thereto (Docs. 37, 38), and defendants' reply in support of summary judgment (Doc. 45). For the reasons that will be explained below, the court finds that summary judgment is due to be denied as to Dianna Alston's claims for conversion and assault against defendant, Kenneth W. Walker (Counts 10 and 11), and should be granted as to all other claims asserted by plaintiffs.

## FACTS

This case concerns events that occurred in 2008 while plaintiffs resided on property which was purchased in July 2008 by defendant, City Councilman, Kenneth Walker. Plaintiffs filed their complaint asserting the following twelve counts: 1) § 1983 claim involving "an unauthorized warrantless illegal stop, and seizure of plaintiff's person"; 2) § 1983 claim against the City for failure to implement appropriate policies, customs and practices; 3) § 1983 claim against Davis and Walker for false arrest; 4) state law claim for false imprisonment against Davis and Walker; 5) state law claim of false arrest against Davis and Walker; 6) state law claim of

unlawful detention against Davis and Walker; 7) negligence claim against all defendants; 8) negligent supervision claim against the City; 9) conspiracy claim against Walker and Davis; 10) conversion claim against Walker; 11) assault claim against Walker; and 12) malicious prosecution claim against Walker.

The events began after plaintiffs, who are sisters, moved into a mobile home park that was owned, at that time, by Terry Leonard. (Doc. 28-1, p. 4). Plaintiffs entered into a lease with Leonard under which they made monthly rent payments. (Doc. 28-1, p. 24). The lease required two weeks notice before plaintiffs could vacate the premises. (Doc. 28-3, p. 2). Plaintiff, Patricia Perkins, testified that it was her understanding that she "could just leave when [she] got ready to." (Doc. 28-1, p. 24).[1] Plaintiff, Dianna Alston, states that the lease was treated as a year to year lease. (Doc. 37-1, ¶ 4). Perkins paid rent to Leonard up until March 2008. (Doc. 28-1, p. 24). Perkins did not pay rent for March, April, May, and June 2008. (Doc. 28-1, p. 25-26). According to Perkins, a fire occurred in her mobile home unit and there was a leak in the utility room on the back of her trailer and Perkins refused to pay rent until everything was fixed. (Doc. 37-2, ¶¶ 4-5).

On May 13, 2008, Leonard filed an unlawful detainer action against Perkins. (Doc. 28-1,

---

[1] The court notes that plaintiffs submitted Perkins' Declaration which states that "this lease was renewed every year." (Doc. 37, p. 2; Doc. 37-2, ¶ 4). However, to the extent Perkins contends this statement means that she thought she was not free to leave, it is contrary to Perkins' prior sworn testimony. An affidavit may be stricken as a sham when it directly contradicts, without explanation, a witness's previous sworn testimony. See McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n. 7 (11th Cir. 2003). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984).

p. 16; Doc. 28-4). On July 1, 2008, during the pendency of the unlawful detainer action, Leonard sold the property to the Walkers. (Doc. 28-7). The action was dismissed for lack of jurisdiction on July 23, 2008. (Doc. 28-4).

On June 10, 2008, before the Walkers had purchased the mobile home park, the Walkers visited the property and asked Alston to show them around. (Doc. 37-1, ¶ 6; Doc. 28-2, pp. 11-12). According to Alston, the Walkers pointed out various items that were cluttering the property and, using very foul language, indicated they would not stand for it when they became owners. (Doc. 37-1, ¶¶ 6-7). Alston talked to Mr. Leonard that afternoon, told him how the Walkers had acted and asked Leonard not to sell the property to the Walkers. (Doc. 37-1, ¶ 8). The next day, while Alston was outside, Mr. Walker reportedly walked up, grabbed Alston's arm about the shoulder, slung her around, and shoved her up against the trailer. (Doc. 28-2, p. 15). According to Alston, Walker screamed at her, within 5 inches of her face, that he wanted to talk to her and wanted to know what she had said to Leonard after they left. (Doc. 37-1, ¶ 9). Alston testified that she got really scared and said that if he wanted to know the truth, that she had told Leonard not to sell them the property because of the way the Walkers acted. (Doc. 28-2, pp. 10-11). Alston reports that she then slipped past Mr. Walker and got away from him. (Doc. 28-2, p. 16). At that time, Alston did not know that Mr. Walker was on the City Council. (Doc. 28-2, p. 16).

On June 18, 2008, Perkins arrived home to find Mr. Walker sitting out in front of her home. (Doc. 28-1, pp. 6-7). Walker introduced himself and asked if he could come in and look at her house. (Doc. 28-1, p. 7). Perkins let Walker in the house and, after looking around, Walker reportedly said that he was "not putting any money into this dump." (Doc. 28-1, p. 7).

On June 27, 2008, Mr. Walker came to Alston's residence and complained about Perkins having told him "to kiss her ass." (Doc. 28-2, p. 15). Alston replied "well, did you do it?" (Doc. 28-2, p. 16). Alston told him "I am sick of you coming down here telling on my sister. She's my sister, not my daughter." "Don't do this any more." "You've kept me upset enough." (Doc. 28-2, p. 16). Alston then shut the door in Walker's face. (Doc. 28-2, p. 16). Walker reportedly stormed off, went and got the weed-eater and cut down tomato plants Alston had planted next to Perkins' trailer. (Doc. 28-1, p. 12; Doc. 28-2, p. 16). Perkins and Alston gathered up the remains of the tomato plants and went down to the City Clerk's Office to see about getting a warrant for Walker's arrest. (Doc. 28-1, p. 17). Personnel at the clerk's office told plaintiffs they had to go next door to the police department.[2] (Doc. 28-1, pp. 17-19). The Mayor walked in and, after plaintiffs stopped him and voiced their complaints, he responded that he could not do anything about it because it was Walker's property. (Doc. 28-1, pp. 50-51). Alston pointed out that it was not Walker's property yet and the Mayor reportedly told plaintiffs to talk to the City Clerk and said he could not let them "sign a warrant on a city councilman." (Doc 37-2, ¶ 9; doc. 37-1, ¶ 12). Plaintiffs went next door to the police department and spoke with a dispatch lady who said all the officers were out on call because of an emergency and that she did not know how long they would be. (Doc. 28-1, pp. 19-20). So, plaintiffs left. (Doc. 28-1, p. 20).

In July, when Walker purchased the property, Perkins tried to give him a check for $350, but Walker refused the check, telling plaintiffs their rent had gone up to $400 per month each. (Doc. 28-1, p. 26; Doc. 28-2, p. 12). Alston reports that Walker also wanted first and last months

---

[2] The court notes that in her affidavit, Perkins now states that Alston first talked with Officer Melvin Taylor about filing a criminal complaint against Walker. (Doc. 37-2, ¶ 8). However, this is contrary to Perkins' prior sworn testimony.

rent and a deposit. (Doc. 28-2, p. 12). Perkins did not pay any rent from July 2008 through June 2009, when she vacated the property. (Doc. 28-1, p. 27). Alston also moved out in June 2009 and never paid any rent to Walker. (Doc. 28-2, pp. 12-13).

On July 12, 2008, Walker sent Alston a letter informing her that she had to move the travel trailer she had stored behind one of the units off the property or pay $12.00 per day storage. (Doc. 38-9, p. 2). On July 13, 2008, Walker sent Alston another letter informing her that because she had not paid her rent, they were terminating her occupancy and that legal action would be taken for possession if she failed to deliver possession within seven days. (Doc. 38-9, p. 3). On July 22, 2008, Walker sent Alston a third letter "demanding formal notice to view the property" and requesting she contact Walker immediately to schedule a time for him to view the property. (Doc. 38-9, p. 4). All three letters were addressed to Alston by her former married name, Diane Brantly or Ms. Brantly. (Doc. 38-9). Walker also sent Perkins a letter on July 22, 2008, "demanding formal notice to view the property" so that he could confirm what damage, if any, has occurred to the property. (Doc. 38-10).

In the afternoon of July 23, 2008, Alston was visiting a neighbor when she heard that police officers were at her house. (Doc. 28-2, pp. 38-39). Alston walked towards her home and said "hey, here I am." (Doc. 28-2, p. 21). Officer Gary Davis asked Alston if she was Dianna Brantly and what was she doing in the park and Alston replied that she lived there. (Doc. 28-2, p. 21; doc. 37-1, ¶ 20). Officer Davis said she did not live there, that Mr. Walker said she moved into the trailer without his permission and that Walker had filed a complaint for criminal trespass. (Doc. 28-2, p. 21-22; Doc. 37-1, ¶ 21). Alston called Perkins to bring her over a copy of the lease agreement. (Doc. 28-2, p. 22). The officer put Alston in the police car and closed the

door. (Doc. 28-2, p. 22). Officer Davis then talked on the phone for several minutes. (Doc. 28-2, p. 22; Doc. 371, ¶ 23). Officer Davis asked Alston if she knew there were warrants for her arrest from Bayou La Batre, Alabama. (Doc. 37-1, ¶ 23). Alston responded that she knew about them and that they involved a traffic violation and that she had missed court. (Doc. 37-1, ¶ 23). Davis got on the telephone again and then came back and said "well, I'm not going to take you to jail today," "but the chief of police wants to see you" and "he's going to be here first thing in the morning." (Doc. 28-2, p. 23). Davis let Alston out of the car and the chief of police never showed up. (Doc. 28-2, p. 23).

The next day, July 24, 2008, Officer Melvin Taylor and Mr. Walker knocked on Perkins' door with a warrant for criminal trespass and told Perkins she had 48 hours to get out or she would be arrested. (Doc. 28-1, pp. 72-73; Doc. 37-2, ¶ 14). Officer Taylor also told Alston she had 48 hours to leave or she would be put in jail (Doc. 28-2, p. 24).

On August 25, 2008, the Walkers filed a complaint against Perkins for ejectment and trespass. (Doc. 28-9). The Walkers filed a motion for summary judgment which was granted by the court on March 6, 2009. (Doc. 28-10; Doc. 45-1, pp. 67-68). The Circuit Court of Mobile County found that the uncontroverted evidence demonstrated that Perkins was not a tenant and had no right of possession to the property. (Doc. 28-10, p. 2, Doc. 45-1, p. 67). The Circuit Court of Mobile County ordered Perkins to vacate the property by March 30, 2009, and enjoined Perkins from entering or being on or within 100 feet from the real property. (Doc. 28-10, pp. 2-3, Doc. 45-1, p. 68). The Walkers filed a similar action for unlawful detainer against Alston that was later amended to state claims for ejectment and trespass. (Doc. 45-2, Doc. 45-3, pp. 2-6). The action was also resolved on summary judgment in favor of the Walkers. (Doc. 45-2, p. 6).

On August 26, 2008, Alston and Perkins drove to City Hall so that Perkins could vote. (Doc. 28-2, pp. 25-26). When they got out of the car, they saw Mr. Walker and Officer Davis outside. (Doc. 28-2, p. 26). Officer Davis and one of the ladies in the courthouse reportedly told Perkins that she could not vote because she was not a citizen of Creola. (Doc. 28-1, p. 69). After they got in the building, Officer Davis reportedly walked in, said "come with me," and then grabbed Alston by the arm and said "the chief wants to talk to you." (Doc. 28-2, pp. 26-27; 37-1, ¶ 30). Officer Davis walked Alston over to the Chief of Police's office, who was not there. (Doc. 28-2, p. 27). Officer Davis turned the light on and told Alston to sit, that the Chief would be there "in a little bit." (Doc. 28-2, p. 27). Perkins went outside and called Judge Don Davis' office before walking over to the Chief's office. (Doc. 28-1, p. 42). Alston reportedly sat in the Chief's office for 30- 40 minutes before the Chief finally showed up. (Doc. 28-2, p. 27; Doc. 37-1, ¶ 31). Perkins testified that the door to the office was open, but Alston states that the office was closed. (Doc. 28-1, p. 45; Doc. 37-1, ¶ 31). Officer Davis asked Perkins to wait in the foyer, but she went into the Chief's office to wait with Alston. (Doc. 28-1, pp. 45-46). The Chief asked Alston if she had gotten the Bayou La Batre stuff taken care of. (Doc. 28-2, p. 27-28). Alston admits that Bayou La Batre had issued a writ of arrest for her, but states that whenever she called and talked to them, they told her just to come down when she gets herself straightened out and gets her health taken care of. (Doc. 28-2, p. 28). Perkins was permitted to cast her vote later that day. (Doc. 37-1, ¶ 33).

Officers Davis and Taylor completed their minimum standard training prior to 2001. (Doc. 28-11, ¶ 2). Officers Davis and Taylor have also completed all of their required continuing education hours each year to maintain their certification. (Doc. 28-11, ¶ 2). Officer

Davis has not had any complaints filed against him of the same nature as the instant lawsuit. (Doc. 28-11, ¶ 3; Doc. 38-14).  Officer Taylor has never had a citizen complaint filed against him. (Doc. 28-11, ¶ 3).

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).   "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle

Glade, 178 F.3d 1175, 1187 (11th Cir.1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Plaintiffs' Claims**

Plaintiffs' complaint asserts the following claims: 1) § 1983 claim involving "an unauthorized warrantless illegal stop, and seizure of plaintiff's person"; 2) § 1983 claim against the City for failure to implement appropriate policies, customs and practices; 3) § 1983 claim against Davis and Walker for false arrest; 4) state law claim for false imprisonment against Davis and Walker; 5) state law claim of false arrest against Davis and Walker; 6) state law claim of

unlawful detention against Davis and Walker; 7) negligence claim against all defendants; 8) negligent supervision claim against the City; 9) conspiracy claim against Walker and Davis; 10) conversion claim against Walker; 11) assault claim against Walker; and 12) malicious prosecution claim against Walker.

**1. § 1983 Claim for Warrantless Stop and Seizure of Plaintiff's Person**

In Count One, plaintiffs claim damages under 42 U.S.C. § 1983 for unlawful arrest and detention. Count one does not specify which defendants it is brought against. However, in their brief, plaintiffs point to the actions of Officer Davis and Mr. Walker in relation to Count One. Plaintiffs also state that they do not assert a claim for excessive force under Count One. (Doc. 37, p. 19). The court notes that plaintiffs' brief does not respond to defendants' arguments that the evidence does not support a claim for taking of property under Count One.

Plaintiffs assert that Officer Davis violated Ms. Alston's rights on two occasions, when he stopped her on July 23, 2008, questioned her and placed her in his car and when he grabbed her by the arm and took her to the Chief of Police's office on August 26, 2008. To the extent Count One is asserted against Davis in his official capacity, the court finds summary judgment is due to be granted. When an officer is sued under § 1983 in his official capacity, the suit is simply "another way of pleading an action against an entity of which an officer is an agent." Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (quoting Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105 , 87 L.Ed.2d 114 (1985)(internal quotations omitted)).

> Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents. See [Kentucky,] 473 U.S. at 165-66, 105 S.Ct. at 3105; Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985); Monell [v. Dept. of Social Services of City of New York], 436 U.S. [658] at 691 [(U.S.N.Y. 1978)], 98 S.Ct. [2018] at 2036 [(1978)]; Farred v. Hicks, 915 F.2d 1530, 1532 (11th Cir.1990). Consequently, a plaintiff cannot rely on a respondeat superior theory to hold a municipality liable for individual actions of its officers. Monell, 436 U.S. at 691, 98 S.Ct. at 2036; Hearn v. City of Gainesville, 688 F.2d 1328, 1334 (11th Cir.1982). "[A] municipality cannot be held liable solely because it employs a tortfeasor." Monell, 436 U.S. at 691, 98 S.Ct. at 2036 (emphasis in original). Instead, in order to recover against a municipality, a plaintiff must establish that the alleged racial discrimination or harassment occurred pursuant to a custom or policy of the municipality. Id. at

694, 98 S.Ct. at 2037; <u>Gilmere v. City of Atlanta</u>, 774 F.2d 1495, 1503 (11th Cir.1985), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); <u>Hearn</u>, 688 F.2d at 1334.

Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond). <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. at 166, 105 S.Ct. at 3105; <u>Brandon v. Holt</u>, 469 U.S. at 471-72, 105 S.Ct. at 877-78. ...

<u>Busby</u>, 931 F.2d at 776. Based on the above, the court finds that summary judgment is due to be granted to the extent the claim is brought against Officer Davis in his official capacity.

To the extent plaintiffs' claim is asserted against Davis in his individual capacity, defendants assert that he is entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Lassiter v. Alabama A & M Univ.</u>, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). Here, it is clear that Officer Davis was acting within the course and scope of his discretionary authority in responding to a complaint for trespass and stopping and questioning Alston about the alleged trespass and about the Bayou La Batre warrants that were on Alston's record. Plaintiffs argue that Davis has offered no real evidence to show the reason or purpose for the stop. However, defendants have offered plaintiffs' own testimony that Davis said he wanted to talk to her

because a complaint had been made that Alston was trespassing and that he asked Alston about the Bayou La Batre warrants. Either of these purposes are valid reasons to stop, question, and investigate the matter further. Plaintiffs point out that the hard copy of the warrants that were submitted to the court appear to not have been delivered to defendants until August 2009. However, plaintiffs have offered no authority which would prohibit an officer from acting on a warrant before obtaining a hard copy. Plaintiffs also argue that if Davis was executing an outstanding warrant, then his actions were ministerial, not discretionary. However, Davis was not merely executing a warrant; if he was, he would have taken Alston to jail without investigating the matter further. More importantly, the Eleventh Circuit has abandoned the dichotomy between discretionary and ministerial in the qualified immunity context. Holloman ex rel Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). The term discretionary authority includes "actions that do not necessarily involve an element of choice." McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995). The actions are discretionary if "they are of a type that fell within the employee's job responsibilities." Holloman, 370 F.3d at 1265. In assessing whether an official was engaged in a discretionary function, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id. In the instant case, the court finds that stopping Alston to ask her about the trespassing complaint and placing Alston in the car while he continued to investigate the trespass and her outstanding warrants were legitimate job related functions that were being pursued through means that were within his power to utilize. Davis was acting within his discretionary authority because his actions were of the type that fell within his job responsibilities.

Plaintiffs also assert that defendants have not produced evidence with regard to the circumstances or purpose for Davis' actions on August 26, 2008. However, as with the prior stop, defendants produced plaintiffs' own testimony describing the events. Taking a person to the Chief of Police's office for questioning about the person's outstanding warrants is clearly

within the officer's job responsibilities. Davis was performing a job-related function through means that were within his power to utilize.

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194. An analysis of whether qualified immunity is appropriate must begin with the threshold determination of whether, based upon the facts taken in the light most favorable to the party asserting the injury, the officer's conduct violates a constitutional right. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508 (2002). If no constitutional right was violated, the court need not inquire further. Id. If, however, a constitutional violation occurred, the court must then determine whether the right was clearly established. Id.

Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures." The parties dispute whether Davis' actions amount to an arrest or merely an investigatory stop. Plaintiffs contend that the incidents should be deemed arrests because Alston was placed in the police car during the first incident and was grabbed and taken control of and held in the Chief's office during the second incident. However, our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S.1, 22-27 , 88 S.Ct. 1868, 1880-1883 20 L.Ed.2d 889 (1968). The court finds that under either label, the issue remains whether Davis' actions were "objectively reasonable" in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978). In Fourth Amendment terminology, an arrest is a seizure of the person, California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and the "reasonableness" of an arrest is determined by the presence or absence of probable cause for the arrest. "Probable cause to arrest exists when law enforcement officials

have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (quotation marks omitted). This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances. See Maryland v. Pringle, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). An officer is not automatically liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause. As the Supreme Court observed in Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable." Thus, even if the court determines that the officers did not in fact have probable cause, the standard to be applied is that of "[a]rguable probable cause," that is, whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[s] could have believed that probable cause existed to arrest." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (quoting Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001)). This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists.

In the instant case, plaintiffs testified that Davis stopped and questioned Alston the first time because Walker complained that she was trespassing on his property and the second time, because Davis said the Chief of Police wanted to question her. As to the first instance, the court finds that Officer Davis had probable cause to stop and place Alston in the car while he investigated the facts and circumstances concerning her alleged trespass and her outstanding warrant for arrest. There were allegations that Alston had committed or was committing a crime. Thus, it was clearly reasonable for Davis to respond to the trespass complaint and to question Alston and have her sit in the police car while he investigated. Although plaintiff says the entire

incident took 30-35 minutes, according to Davis, Alston was only in the car for 5 minutes. Officer Davis carried out his investigation promptly, reviewed the lease, once Perkins brought it to the scene, and released Alston after making a phone call. Plaintiff has not shown that her detention was unreasonable.

The court also finds that there was no constitutional violation when plaintiff was escorted to the police department on August 26, 2008. According to plaintiffs, Davis told Alston that the Chief wanted to talk to her and when the Chief arrived, he had questions for Alston about the status of the arrest warrants from Bayou La Batre. Perkins testified that the door to the Chief's office was open and that, although she was asked to leave, she was allowed to stay with Alston. Alston admits that Bayou La Batre had issued a writ for her arrest and the court finds it was appropriate for the police to question her about the warrant. Davis did not arrest Alston, even though there was a warrant out for her arrest. The court, after reviewing all the circumstances of this case, finds that the it was reasonable for the officers to stop and question Alston and to believe that probable cause existed to take her to the Chief's office for questioning. The court does not find that Alston's constitutional rights were violated.

Even if any of the claimed conduct violated plaintiffs' constitutional rights, defendants are still entitled to qualified immunity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2733, 73 L.Ed.2d 396 (1982). The right was "clearly established," if at the time of the incident, the "pre-existing law...dictate[s], that is, truly compel[s]...the conclusion for every like-situated reasonable government agent that what defendant [was] doing violate[d] federal law in the circumstances." Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994). The plaintiff may not discharge his burden "by referring to general rules and to the violation of abstract 'rights'." Id. at 1150. Qualified immunity is evaluated on the basis of what the official knew at the time of the challenged action, not "by hindsight, based on later events." Id. at 1150. The court finds that Davis' alleged

violations did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Therefore, the court finds that Officer Davis is entitled to qualified immunity.

Plaintiffs state that the claims against Walker under Count One are premised upon malicious prosecution. Plaintiffs assert that Walker, while acting under color of law, initiated a failed criminal prosecution against them. "To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation [of a federally protected right]." Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004) (citation omitted). Alabama's common law tort of malicious prosecution includes the following five elements: "(1) a judicial proceeding initiated by the defendant, (2) the lack of probable cause, (3) malice, (4) termination in favor of the plaintiff, and (5) damage."Cutts v. American United Life Ins. Co., 505 So. 2d 1211, 1214 (Ala. 1987) (citations omitted). Alabama jurisprudence has consistently held that "[m]alicious prosecution actions are disfavored in the law for the very reason that 'anyone who has reasonable cause to believe that there is reasonable cause for legal redress and protection has a lawful right to seek such redress without risk of being sued and having to respond in damages for seeking successfully to enforce his rights.'" Shoney's, Inc. v. Barnett, 773 So.2d 1015, 1023 (Ala.Civ.App. 1999) (quoting Alabama Power Co. v. Neighbors, 402 So.2d 958, 962 (Ala. 1981)). Probable cause in a malicious prosecution action is defined as: "such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." Delchamps, Inc. v. Morgan, 601 So.2d 442, 445 (Ala. 1992) (citation omitted). The question then is not whether plaintiffs were in fact guilty as charged, but whether the defendant in fact saw events that would lead him to believe that he was guilty. See Id. (citation omitted).

Plaintiffs assert that Mr. Walker initiated criminal prosecutions against them for trespass and that the prosecutions were later dismissed. Plaintiffs contend that Walker knew that cause

was lacking because the day before, on July 23, 2008, the action filed by Mr. Leonard for detainer had been dismissed in plaintiff's favor.[3]  However, the detainer action was dismissed for lack of jurisdiction because it was brought by Leonard, who no longer owned the property in question.  Plaintiffs imply that it is suspicious that the criminal charges were never pursued further.  However, defendants contend that the Walkers simply decided to file complaints for ejectment and trespass against both plaintiffs in lieu of pursuing criminal trespass charges.  In both of these civil cases, the state court found in favor of the Walkers and against plaintiffs.  The Circuit Court of Mobile County expressly found that the uncontroverted evidence demonstrated that Perkins was not a tenant and had no right of possession to the property.   While the standard for civil liability is less stringent than for criminal liability, the court's finding in favor of Walker indicates that the criminal claim had a legitimate basis in fact.  There is no evidence that the criminal trespass complaints contained falsified facts.  The Walkers owned the property at the time they filed the criminal complaints and it is undisputed that plaintiffs never paid any rent to the Walkers.  The parties dispute whether the leases entered into between plaintiffs and Leonard were still in effect.  However, the court does not find it was unreasonable to believe that the leases had been terminated, especially since the Walkers had sent plaintiffs letters stating that they were "terminating her occupancy."  The court finds that there was probable cause to initiate a proceeding for trespass against plaintiffs.  Therefore, summary judgment is due to be granted in favor of Walker as to plaintiffs' claim for malicious prosecution under Count One.

**2. § 1983 Claim for City's Failure to Implement Appropriate Policies,**

**Customs and Practices**

In Count Two, plaintiffs assert a § 1983 claim against the city of Creola for failure to implement appropriate policies, customs and practices.  Municipalities are not wholly immune

---

[3] Plaintiffs point to statements reportedly made by the judge that there was no trespass. However, as defendants point out, such statements are hearsay and do not follow the stated reasons for dismissal in the order entered in the detainer action.

from liability. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 700, 98 S.Ct. 2018, 56 L.Ed.2d

611 (1978) (overruling Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)).

However, "it is well established that a municipality may not be held liable under section 1983 on

a theory of respondeat superior." Davis v. DeKalb County Sch. Dist., 233 F.3d 1367, 1375 (11th

Cir. 2000). In order to be held liable for a § 1983 violation, a municipality must be found to

have itself caused the constitutional violation at issue. Monell, at 694-95, 98 S.Ct. 2018; City of

Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The injury must

have been caused by "a policy statement, ordinance, regulation, or decision officially adopted

and promulgated by that body's officers." Monell, 436 U.S. at 690. In addition, a plaintiff must

show "a municipal action was taken with ... deliberate indifference to its known or obvious

consequences." Davis, 233 F.3d at 1375-76. In Board of the County Commissioners of Bryan

County v. Brown, 520 U.S. 397, 117 S.Ct. 1382 (1997), the test set out above by Monell was

subsequently narrowed by the Supreme Court when it stated:

> [I]t is not enough for a § 1983 plaintiff to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Brown, 520 U.S. at 404, 117 S.Ct. at 1388. The plaintiff's burden is heavy. As noted by the

Eleventh Circuit Court of Appeals:

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities ....' " (citing City of Canton [v. Harris], 109 S.Ct. [1197] at 1206 [(1989)]); see also Brown, [520 U.S.] at 415-16, 117 S.Ct. at 1394 ("Where a court fails to adhere to rigorous requirements of culpability and causation,

18

municipal liability collapses into respondeat superior liability.").

Gold v. City of Miami, 151 F.3d 1346, 1351 n. 10 (11th Cir. 1998). Under § 1983, the "requisite degree of culpability" is that the municipality acted with at least "deliberate indifference" to the consequences of its actions. Plaintiffs must show not only that the municipal officers violated their constitutional rights, but that the City's policies were the "moving force" behind their injury.

"A finding of culpability cannot depend simply on the mere probability that any officer inadequately screened will inflict any constitutional injury, but must instead depend on a finding that the particular officer was 'highly likely to inflict the particular injury suffered by the plaintiff.'" Romero v. City of Clanton, 220 F.Supp.2d 1313, 1317 (M.D. Ala. 2002) (quoting Brown, 520 U.S. at 412) (emphasis in original). "[O]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the 'plainly obvious consequence of the decision to hire the applicant would be a deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference.'" Raby v. Baptist Medical Center, 21 F.Supp.2d 1341, 1353 (M.D. Ala. 1998) (quoting Brown, 520 U.S. at 411).

A city's policy or custom regarding training of its officers may be actionable. However, to maintain such a claim, plaintiffs must show "some evidence of a pattern of improper training to sustain [their] claim, and [they] must show that [the city] was aware of the deficiencies in the program." See Mercado v. City of Orlando, 407 F.3d 1152, 1161 (11th Cir. 2005) (citing City of Canton v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The Eleventh Circuit has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise. Church v. City of Huntsville, 30 F.3d 1332, 1342-46 (11th Cir. 1994), (holding that the plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated); see also Popham v. City of

Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train).

Count Two of plaintiffs' complaint describes the policies and practices that the City allegedly failed to implement as follows:

> 36) Defendant city of Creola, implicitly or explicitly adopted and implemented careless and reckless policies, customs, or practices, that included, among other things, of allowing employees of the Creola Police Department to act at the bequest of City officials without any reasonable probable cause, and harass, arrest, detain and imprison citizens of the City without lawful justification.

> 37) The failure of the city officials to adequately train and supervise Defendants Davis amounts to deliberate indifference to the rights of the Plaintiffs s to be free from excessive force and unreasonable seizures under the Fourth , Fifth, and Fourteenth Amendments to the Constitution of the United States.

(Doc. 2-1, p. 8).  The above indicates that the injuries complained of in Count Two resulted from Officer Davis' detention of Alston.  This court found above that Officer Davis' actions were reasonable and thus, that there was no constitutional injury.  Even if plaintiffs suffered a constitutional injury, plaintiffs have not offered any evidence to show that the City of Creola caused the injury by a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the City.  There is no evidence of a pattern or practice of incidents or indifference.  There is no evidence of a pattern of improper training.  In fact, the only evidence regarding training indicates that the Officer directly at issue received proper training.  Plaintiffs point out that some complaints had been filed against Officer Davis in the past.  However, Officer Davis has not had any complaints filed against him of the same nature as the instant lawsuit.  The court also notes that the complaints submitted as evidence consisted of a string of complaints all filed by one individual. (Doc. 38-14).  These past complaints do not indicate a pattern of improper training.  There is also no evidence that other officers have committed similar violations as the ones Davis is alleged to have committed.  Thus, summary judgement is due to be granted in favor of defendants as to plaintiffs' claim under Count Two relating to Officer Davis' detention or arrest of Alston and his training and supervision.

Plaintiffs also assert in their brief that the City should be held liable under § 1983 for denying Alston the right to file criminal charges. (Doc. 37, p. 25).  However, plaintiffs have pointed to no custom or policy of the city that was the driving force behind plaintiffs' alleged due process violation.  Plaintiffs point to the Mayors' express denial of their right to file criminal charges.  Plaintiffs, citing <u>Mercado v. City of Orlando</u>, 407 F.3d 1152 (11th Cir. 2005)[4], assert that the City can be held responsible when the Mayor stands by with knowledge of what is happening and refuses to intervene.  However, the Mayor had no actual knowledge of any wrongdoing.  The Mayor was not present when Walker committed the alleged crime and had no way of stepping in to intervene.  There is no evidence the Mayor directed any subordinates to act unlawfully or that he knew that any subordinates would act unlawfully.  The Mayor was simply not the proper channel to follow when attempting to make a criminal complaint of this manner.  The Mayor directed plaintiffs to go to the police department to file their complaint.  No officers were available at that time because of an emergency and plaintiffs decided not to wait.  There is no evidence that plaintiffs were not permitted to wait, were discouraged from waiting or that they could not come back at another time to file their complaint.  The court finds that the alleged violation does not rise to the level of a constitutional violation and that plaintiffs have pointed to no custom or policy of the City that was responsible for plaintiffs' alleged injury.

### 3. § 1983 False Arrest Claim Against Davis and Walker

Count Three of plaintiffs' complaint alleges that "Davis and Walker acted under color of state law by falsely arresting and detaining Plaintiff Alston with no basis in fact or law to do so."

---

[4] The court notes that <u>Mercado</u> is an excessive force case that does not appear to support plaintiffs' assertion.  The <u>Mercado</u> court recognized that a municipality is liable under § 1983 if the plaintiff's injury was caused by a pattern of improper training of police officers of which the municipality was aware and deliberately indifferent. <u>Id.</u> at 1161.  For a Florida employer to be found liable of negligent retention, a plaintiff must allege that the employer "was put on notice of the harmful propensities of the employees." <u>Id.</u> at 1162.

(Doc. 2-1, ¶ 41).  This appears to be a restatement of Count One except that Walker is added as an alleged offender.  It is unclear under the facts presented how Walker could be held responsible for false arrest under § 1983.  "[T]o hold these individual Defendants liable under § 1983, the Plaintiff must allege that they either actually participated in the alleged constitutional violation or that a causal connection exists linking their supervisory actions to the violation." Smith v. Citrus County, Fla., 2005 WL 1065545, *3 (M.D. Fla. May 2, 2005) (citing Lewis v. Smith, 855 F.2d 736, 737 (11th Cir. 1988)).  Although Walker reportedly made a complaint against Alston that resulted in Officer Davis allegedly arresting Alston June 23, 2008, and Walker was present or near by when Alston was allegedly arrested on August 26, 2008, there is no evidence that Walker arrested Alston on those occasions, much less that he did so under color of state law.  The introductory paragraph of plaintiffs' complaint asserts that the "individual Defendant was acting under color of state law when he used his authority conferred by elective office to direct city police officers to twice make an unlawful stop of one of the Plaintiffs which stop resulted in and (sic) unlawful arrest and imprisonment..." (Doc. 2-1, p. 1).  However, there is no evidence that Walker directed officers to stop or arrest plaintiffs other than by making a complaint, as any citizen may do.  There is no evidence that Walker had any supervisory authority over Officer Davis or that he had on the occasions in question or any other occasion directed Davis' actions.   The only other incident that plaintiffs could possibly point to was in June 2008 when Walker reportedly grabbed Alston's arm, shoved her up against the trailer and screamed at her.  These actions do not appear to be alleged under Count Three, and the court finds they would fail if they were alleged because the actions do not amount to an arrest.  Even if such actions could be deemed an arrest, they clearly were not done under color of law, since plaintiffs admit that Alston did not even know at that time that Mr. Walker was on the City Council.  The court finds that summary judgment is due to be granted in favor of defendants as to Count Three.

**4. State Law Claim for False Imprisonment against Davis and Walker**

Count Four of the complaint asserts that "Davis and Walker acted under color of state law by falsely imprisoning and detaining Plaintiff Alston with no basis in fact or law to do so." (Doc. 2-1, ¶ 44). Alabama's false imprisonment statute, § 6-5-170, provides: "False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." ALA.CODE § 6-5-170.

> "For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment."

Crutcher v. Wendy's of North Alabama, Inc., 857 So.2d 82, 92 (Ala. 2003) (quoting Crown Central Petroleum Corp. v. Williams, 679 So.2d 651, 653 (Ala. 1996)).

Alabama law provides statutory immunity to law enforcement officers "from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." ALA.CODE § 6-5-338(a). This immunity protects not only officers but also "governmental units or agencies authorized to appoint peace officers." § 6-5-338(b); see e.g., Ex parte City of Gadsden, 781 So.2d 936, 940 (Ala. 2000) ( "The plain language of [§ 6-5-338(b)] extends that discretionary-function immunity to the City."). "[W]hether a qualified police officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by Ex parte Cranman, 792 So.2d 392 (Ala. 2000)." Blackwood v. City of Hanceville, 936 So.2d 495, 504 (Ala. 2006) (internal quotes omitted). Under Cranman, "[a] State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's ... exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons...." Cranman, 792 So.2d at 405 (emphasis in original). In order to constitute a "discretionary function" for purposes of § 6-5-338(a), the defendant must have had at least arguable probable

cause to arrest. <u>Borders v. City of Huntsville</u>, 875 So.2d 1168, 1179-80, 1181 (Ala. 2003). Both probable cause and arguable probable cause are defined in Alabama consistently with the federal definitions discussed above. <u>See</u> <u>e.g.</u>, <u>id.</u>; <u>City of Birmingham v. Major</u>, 9 So.3d 470, 478 (Ala. 2008). As previously discussed, Davis had arguable probable cause to detain Alston based on the trespass complaint and the Bayou La Batre warrant for Alston's Arrest.

However, "[n]otwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity ... when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." <u>Cranman</u>, 792 So.2d at 405 (emphasis in original). For purposes of the immunity issue, "willful," "malicious" and "bad faith" all require evidence that the defendant acted with the intent to injure or with ill will towards the plaintiff. <u>Ex parte Nall</u>, 879 So.2d 541, 546 (Ala. 2003); <u>Williams v. City of Montgomery</u>, 48 F.Supp.2d 1317, 1328 (M.D.Ala. 1999). In the arrest context, a plaintiff may satisfy his burden "by, for example, showing that the defendant had a personal ill will against the [plaintiff] and that he maliciously or in bad faith arrested him solely for purposes of harassment." <u>Ex parte Tuscaloosa County</u>, 796 So.2d 1100, 1107 (Ala. 2000) (internal quotes omitted). In the instant case, there is no evidence that Officer Davis acted maliciously, fraudulently or in bad faith. During the first incident, the evidence shows that Davis investigated the matter and released Alston. During the second incident, although Davis allegedly grabbed Alston by the arm, he, then, simply escorted her to the Chief's Office. There is no evidence that Davis used foul language, yelled, or acted maliciously.

Although defendants argue that § 6-5-338(a) also extends discretionary immunity to Walker, Walker was not performing any discretionary duties of his job as councilman during any of the alleged incidents. Additionally, the court finds that there is evidence that Walker harbored ill will towards the plaintiffs. However, Walker was not even present during Alston's first alleged arrest by Officer Davis and during the second, although Walker was near by, there is no

evidence that he participated in Alston's alleged detention. Merely making a complaint or reporting to the police that he believed Alston was trespassing does not constitute instigation or participation in Alston's detention or arrest. See Crown Central Petroleum Corp. v. Williams, 679 So.2d 651, 654 (Ala. 1996) ("liability for false imprisonment, like liability for malicious prosecution, cannot be predicated merely on...a person's good faith act of identifying one suspected of a crime" because such an act "is not regarded in the law as an instigation of or participation in the detention or arrest."); Dolgencorp, Inc. v. Pounders, 912 So.2d 523, 529 (Ala.Civ.App. 2005) (citing Crown Central Petroleum supra, finding that conduct did not rise to the level of instigation or participation where, although the plaintiff did not actually take anything from the store, the manager suspected that patron might have shoplifted and there was no testimony tending to show that the defendant explicitly directed officers to arrest the patron or that she attempted to persuade or influence them to arrest the patron, even though manager suspected that patron might have shoplifted). There is no evidence that Walker used any force, threatened any force or even directed that any force be used relating to these two incidents.

The only incident where Walker allegedly used any force or threat of force was on June 11, 2008, when he reportedly walked up, grabbed Alston's arm about the shoulder, slung her around, and shoved her up against the trailer. According to Alston, Walker screamed at her, within 5 inches of her face, that he wanted to talk to her and wanted to know what she had said to Leonard. Alston testified that she got really scared and said that if he wanted to know the truth, that she had told Leonard not to sell them the property because of the way the Walkers acted. Alston reports that she then slipped past Mr. Walker and got away from him. It does not appear from the complaint that this conduct is the subject of plaintiffs' Count Four, since it complains only of Davis' and Walkers' acts done under color of state law. Walkers' actions on June 11, 2008, clearly were not done under color of state law since plaintiffs admit that they did not even know that Mr. Walker was a city councilman until after the event took place. There is no evidence or allegation that Walker claimed to be acting under color of state law and Alston

had no reason to think that Walker was acting under color of state law.   Even if Walkers' actions on June 11, 2008, are properly asserted as a basis for Alston's false imprisonment claim, the court finds that Walker's actions did not deprive Alston of her personal liberty.   Alston has not alleged that Walker held her or forced her to remain there.   Walker did not threaten her or tell her she could not leave.   Alston was not cornered or closed in a room, but was outside and, according to her own testimony, was able to slip past Walker.   As such, the court finds that plaintiffs have not supported a false imprisonment claim against Mr. Walker.

### 5. State Law False Arrest Claim against Davis and Walker

Count Five of plaintiffs' complaint asserts a claim for false arrest under Alabama common law.   Count Five alleges that "Davis and Walker acted under color of state law by falsely arresting and detaining Plaintiff Alston with no basis in fact or law to do so." (Doc. 2-1, ¶ 47).   The court finds that Alston's state law claim of false arrest fails for the same reason that her federal false arrest and false imprisonment claims fail.   Plaintiffs have not shown that Officer Davis did not have arguable probable cause or that his actions were unreasonable under the circumstances and he is entitled to discretionary function immunity.   Plaintiffs also have not shown that Mr. Walker instigated, participated or effected Alston's arrest.   Therefore, summary judgment is due to be granted in favor of defendants as to Count Five.

### 6. State Law Claim of Unlawful Detention against Davis and Walker

Count Six of plaintiffs' complaint asserts a claim for unlawful detention alleging that "Davis and Walker acted under color of state law by unlawfully detainer (sic), Plaintiff Alston with no basis in fact or law to do so." (Doc. 2-1, ¶ 50).   This is essentially a restatement of plaintiffs' false imprisonment claim asserted in Count Four.   The court finds that summary judgment should be granted as to Alston's unlawful detention claim for the same reasons the court finds summary judgment should be granted as to Count Four.

### 7. Negligence Claim against All Defendants

Plaintiffs allege in their complaint under Count Seven that "[e]ach Defendant owed Plaintiffs a duty to use due care at or about the times of the aforementioned incidents" and that they "negligently breached said duty." (Doc. 2-1, ¶ 53, 54). Defendants assert that plaintiffs have not presented any evidence that defendants breached any duty owed to the Plaintiffs. Plaintiffs' only response is that "the Defendant owed Plaintiffs a duty to not file false charges against them and to not cause their unlawful arrest and detention." (Doc. 37, p. 29). The court has discussed the lawfulness of Alston's alleged arrests and detentions at length. After reviewing plaintiffs' vague assertions of negligence and considering the previous discussions regarding Alston's alleged arrests and detentions, the court finds plaintiffs have failed to support their claims for negligent breach of the duty of care. There is no evidence that defendants negligently breached any duty of care.

### 8. Negligent Supervision Claim against the City

Count Eight of plaintiffs' complaint asserts a claim for negligent supervision, alleging that the "City of Creola negligently supervised Defendants (sic) Davis by failing to provide proper training and outline proper procedure in effecting an arrest and by first obtaining probable cause." (Doc. 2-1, ¶ 57). To recover under a theory of negligent supervision, plaintiffs must show by "affirmative proof that [the employee]'s alleged incompetence was actually known to the [employer] or was discoverable by [the employer] if it had exercised care and proper diligence." Ledbetter v. United Am. Ins. Co., 624 So.2d 1371, 1373 (Ala. 1993). In negligent supervision cases, "negligence will not be found by inference." N.J. v. Greater Emanuel Temple Holiness Church, 611 So.2d 1036, 1037 (Ala. 1992). In the instant case, there is no evidence that the City knew that Officer Davis was incompetent or that it could have discovered that Officer Davis was incompetent if it had exercised care and proper diligence. There is no evidence that Officer Davis' training was lacking or that he had displayed incompetent in

previous arrests.  Moreover, the court found above that Officer Davis' actions were reasonable and that there was arguable probable cause for the alleged arrests.  Therefore, summary judgment is due to be granted in favor of defendants as to Count Eight.

### 9. Conspiracy Claim against Walker and Davis

Count Nine of plaintiffs' complaint asserts a claim for conspiracy and alleges that "Walker and Davis participated in a common design through a concert of action to deprive Plaintiff Alston of her rights as described herein." (Doc. 2-1, ¶ 60).  "Civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." Keith v. Witt Auto Sales, Inc., 578 So.2d 1269, 1274 (Ala. 1991) (citing Eidson v. Olin Corp., 527 So.2d 1283 (Ala. 1988)).  A plaintiff alleging a conspiracy must have a valid underlying cause of action. Drill Parts & Serv. Co. v. Joy Mfg. Co., 619 So.2d 1280, 1290 (Ala. 1993).  "[A] conspiracy claim must fail if the underlying act itself would not support an action." Triple J Cattle, Inc. v. Chambers, 621 So.2d 1221, 1225 (Ala. 1993).  Since the court has disposed of all underlying claims about which Davis and Walker could have conspired, the court finds that plaintiffs' conspiracy claim also fails.

### 10. Conversion Claim against Walker

Count Ten of plaintiffs' complaint asserts a claim for conversion, alleging that "Walker trespassed on Plaintiff's property and unlawfully cut down all of her tomato plants thereby depriving her of property." (Doc. 2-1, ¶ 64).  Plaintiffs further allege that Mr. Walker "acted intentionally or in reckless disregard of probable consequences in the exercise of dominion or control over Plaintiff Alston's personal property, to wit, her tomato plants..." (Doc. 2-1, ¶ 63).

> "Conversion consists of (1) an act or omission by the defendant (2) with the intent to assert control over property (3) that belongs to the plaintiff (4) resulting in substantial interference to the plaintiff's possessory rights. In other words, a conversion is said to consist '"either in the appropriation of the thing to the party's own use and beneficial enjoyment, or its destruction, or in exercising of dominion

over it, in exclusion or defiance of the plaintiff's right, or in withholding the possession from the plaintiff, under a claim of title inconsistent with his own."' But '[t]he bare possession of property without some wrongful act in the acquisition of possession, or its detention, and without illegal assumption of ownership or illegal user or misuser, is not conversion.'"

S.B. v. Saint James School, 959 So.2d 72, 95 (Ala. 2006) (quoting Martin v. Luckie & Forney, Inc., 549 So.2d 18, 19 (Ala. 1989)). Defendants assert that Walker had a right to cut the grass on the property. According to defendants, Walker was merely cutting the grass, implying that any damage to plaintiffs' tomato plants was inadvertent. However, Alston testified that Walker stormed off following an altercation between Alston and Walker and she watched him intentionally cut down her tomato plants. The court also notes that the Mobile Home Park did not yet belong to Walker at that time. Looking at the facts in the light most favorable to plaintiffs, the court finds that there is factual support for plaintiffs' claim that Walker intentionally asserted control over property that arguably belonged to Altson. As such, the court finds that summary judgment should be denied as to Alston's claim for conversion.

### 11. Assault Claim against Walker

Count Eleven of plaintiffs' complaint asserts that Walker "knowingly, wantonly, intentionally, and with gross disregard for the rights of Plaintiff, assaulted her..." (Doc. 2-1, ¶ 69). Count Eleven also alleges that "Alston avers that the actions of the Defendant Walker breached a duty of care owed to Plaintiff to not assault her or cause her physical harm or injury, except to the extent allowed by law." (Doc. 2-1, ¶ 68). Defendants assert that there is no evidence of any intentional or wanton conduct on the part of Walker sufficient to sustain such a claim. (Doc. 27, p. 31). To which plaintiffs respond that "The act, as alleged in Alston's Complaint, and affirmed in her Declaration satisfies the requirements of an assault." (Doc. 37, p. 30).

In Alabama, the elements of an assault and battery claim are as follows:

'[A]n intentional, unlawful offer to touch the person of another in a rude or angry

> manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt if not prevented. A successful assault becomes a battery, which consists of the touching of another in a hostile manner.

Wright v. Wright, 654 So.2d 542, 544 (Ala. 1995). It is not clear form plaintiffs' complaint or their brief what conduct is the subject of plaintiffs' assault claim. However, the court finds that Alston has alleged facts which could satisfy such a claim. In particular, the court points to Alston's claim that on June 10, 2008, Walker grabbed Alston's arm about the shoulder, slung her around, shoved her up against the trailer, and then screamed at her within 5 inches of her face. Such facts, if proven, could support plaintiffs' claim.[5] Therefore, summary judgment is due to be denied as to Alston's claim for assault against Walker.

### 12. Malicious Prosecution Claim against Walker

In plaintiffs' last count, they assert a malicious prosecution claim against Walker. The complaint asserts that "Walker initiated a prior judicial proceeding against both Plaintiffs; there was no probable cause to institute the prior proceeding, this Defendant acted with malice in instituting the prior proceeding and the prior proceeding terminated favorably to the Plaintiffs." (Doc. 2-1, ¶ 72). The court found above, under Count One, that Walker had probable cause to initiate a proceeding for trespass against plaintiffs. The court finds that summary judgment is due to be granted in favor of Walker as to plaintiffs' claim for malicious prosecution under

---

[5] In fact, it appears that plaintiffs' allegation would support a claim for battery as well. "In a civil case, the elements of battery are: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. Ex parte Atmore Cmty. Hosp., 719 So.2d 1190 (Ala.1998) (emphasis added). Our Supreme Court has explained that " '[a] battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another.' " Surrency v. Harbison, 489 So.2d 1097, 1104 (Ala. 1986) (quoting Singer Sewing Mach. Co. v. Methvin, 184 Ala. 554, 561, 63 So. 997, 1000 (1913) (emphasis added))."
Wood v. Cowart Enterprises, Inc., 809 So.2d 835, 837 (Ala.Civ.App. 2001).

Count Twelve for the same reasons as the court found plaintiffs' § 1983 claim for malicious prosecution failed.

## CONCLUSION

For the reasons stated above, the court finds that defendants' motion for summary judgment (Doc. 26) is due to **GRANTED** in part and **DENIED** in part. Summary judgment is hereby **DENIED as to Dianna Alston's claims for conversion and assault against defendant Kenneth W. Walker** (Counts 10 and 11), and **GRANTED as to all other claims asserted by plaintiffs.**

Because the two remaining claims are supplemental claims under state law, pursuant to 28 U.S.C. § 1367(c)(3), the court declines to exercise supplemental jurisdiction over those claims. Counts 10 and 11 are **DISMISSED** without prejudice.

**DONE** and **ORDERED** this 14th day of May, 2010.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE